IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 06-cv-00969-MJW-KMT**

TERRY BLEVINS,

Plaintiff,

v.

LARRY REID, Warden, CSP, et al.,

Defendants.

---

### MEMORANDUM DECISION AND ORDER ON
### DEFENDANTS' MOTION AND BRIEF IN SUPPORT OF SUMMARY JUDGMENT
### (Docket No. 218)

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

This case is before this court upon an Order Referring Case Pursuant to 28

U.S.C. § 636(c) issued by Judge Marcia S. Krieger on August 8, 2008, which referred

the matter for all purposes pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2

upon the consent of the parties to the exercise of jurisdiction by a United States

Magistrate Judge.  (Docket No. 159).  Now before the court is the Defendants' Motion

and Brief in Support of Summary Judgment (Docket No. 218) to which plaintiff filed a

Response (Docket No. 227).

**Background**

On June 12, 2008, Judge Krieger significantly narrowed the claims and damages

sought in this case in an Order Granting, in Part, and Denying, in Part, Motions to

2

Dismiss.  (Docket No. 139).  That Order is incorporated by reference herein.  As noted

in that Order, in his Third Amended Prisoner Complaint (Docket No. 99), plaintiff raises

claims against various employees of the Colorado Department of Corrections ("CDOC")

pursuant to 42 U.S.C. § 1983.  The pertinent factual allegations in that pleading were

summarized by Judge Krieger as follows:

> Mr. Blevins [the plaintiff] has been housed in administrative
> segregation ["Ad Seg"] for 3 ½ years.  He was first assigned to [Ad Seg] in
> January 2004 while he was housed at the Buena Vista Correctional
> Facility ["Buena Vista"].  In June 2004, he was moved to a private prison in
> Mississippi, and CDOC put all of his personal property into storage.  While
> Mr. Blevins was in Mississippi, CDOC lowered his custody level - which
> resulted in Mr. Blevins accruing earned time - without giving Mr. Blevins
> any notice.  On June 28, 2005, he returned to Colorado and was assigned
> to the Colorado State Penitentiary ["CSP"], an [Ad Seg] facility.
>
> On July 7, 2005, Mr. Blevins was given an [Ad Seg] hearing prior to
> official reassignment.  Ms. Lindsey, Ms. Slack and Mr. Misel participated in
> the hearing.  The result of that hearing was that Mr. Blevins was
> reassigned to [Ad Seg], based upon the finding that he was associated
> with a security threat group ["STG"].  Mr. Reid affirmed the decision to
> reassign Mr. Blevins to [Ad Seg].
>
> In October 2005, Mr. Reid held a "warden review hearing" and
> refused to remove Mr. Blevins from [Ad Seg] into the general population or
> a diversion unit due to poor attitude.  Mr. Blevins received no notice of this
> hearing and believes that an additional, secret warden review hearing
> occurred in either December 2006 or January 2007.  It was purportedly
> conducted by Mr. Reid and Mr. Martinez.  At that hearing, Mr. Martinez
> opined that Mr. Blevins did not belong in [Ad Seg], but Mr. Reid opined
> that Mr. Blevins needed to progress through the pro-unit.[1]  Mr. Blevins did
> not receive notice of this hearing or its results.
>
> A "pro-unit hearing" was held in December 2006.  At that hearing,
> Mr. Barr voted not to allow Mr. Blevins to move into the pro-unit.  Another

---

[1]The PRO Unit is the "Progressive Reintegration Opportunity Unit, Quality of Life
Levels Four through Six.  Specialized program that is designed to transition offenders
from [Ad Seg] to general population."  (Docket No 218-4 at 1, Administrative Regulation
Implementation/Adjustments, § III(R)).

3

pro-unit hearing occurred in July 2007. This time, Mr. Blevins was approved for placement into the pro-unit by a 5-4 vote, and was told to write two essays, but was then told to write a third essay because "they" did not like the first two.

In August 2007, Mr. Blevins was told he had to attend a pro-unit meeting right away. In attendance were Mr. Barr, Mr. Martinez, Mr. Davidson, Ms. Gail, John Doe, and Jane Doe, all of whom knew that Mr. Blevins had commenced a lawsuit involving the CDOC. At that hearing, Mr. Blevins was informed that the committee members had voted not to move him to the pro-unit, that one of his essays was inappropriate, and that he should consider himself a permanent resident of the [CSP]. Mr. Blevins was not given an opportunity to defend himself. . . .

(Docket No. 139 at 3-4).

The court notes that Judge Krieger determined in that Order that the following

claims were the only claims remaining:

**Claim 4:** Mr. Reid, Ms. Lindsey, Ms. Slack, and Mr. Misel violated Mr. Blevins' right to due process when they reassigned him to [Ad Seg] in June 2005, by erroneously classifying him as a member of an STG.

**Claim 5:** Mr. Reid violated Mr. Blevins' right to due process in October 2005 when he conducted a warden review hearing without advance notice, considered Mr. Blevins' attitude in determining whether to remove him from [Ad Seg], and failed to advise Mr. Blevins in writing of the outcome of the review.

**Claim 6:** Mr. Reid and Mr. Martinez violated Mr. Blevins' right to due process when they did not notify him of a second warden hearing which occurred in December 2006 or January 2007, nor of the resulting decision.

**Claim 7:** Mr. Barr, Mr. Martinez, Mr. Davidson, Ms. Gail, John Doe and Jane Doe violated Mr. Blevins' right to due process because they did not give him advance notification of the July 2007 pro-unit review hearing.

**Claim 8:** Mr. Barr, John Doe, Mr. Davidson, Mr. Martinez, Ms. Gail, and Jane Doe violated Mr. Blevins' right to due process because they based their August 2007 decision to revoke his assignment to the pro-unit upon what he wrote in his essays, and denied him an opportunity to defend his essays at the hearing.

**Claim 11:** Mr. Barr and Mr. Martinez retaliated against Mr. Blevins when

they decided not to move him to the pro-unit because he was suing Mr.
Reid over his placement.

**Claim 12:** Mr. Barr, John Doe, Mr. Davidson, Mr. Martinez, Ms. Gail, and Jane
Doe retaliated against Mr. Blevins when, in August 2007, they decided to deny
him a transfer into the pro-review unit, and to keep him at the [CSP], because he
had commenced a lawsuit against Mr. Reid over his placement, and because of
the contents of an essay he wrote.

(Docket No. 139 at 23-24), Blevins v. Reid, 2008 WL 2428941, *12 (D. Colo. June 12,

2008).  Furthermore, Judge Krieger found that "Mr. Blevins is barred from recovering

compensatory relief on these claims.  Claims 4, 5, 6, and 7 are limited to the recovery of

injunctive relief.  Claims 8, 11 and 12 are limited to the recovery of injunctive relief and

punitive damages."  (Docket No. 139).  Defendants now move for summary judgment on

these remaining claims.  (Docket No. 218).

Rule 56(c) provides that summary judgment shall be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A

party seeking summary judgment bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the pleadings,

depositions, interrogatories, and admissions on file together with affidavits, if any, which

it believes demonstrate the absence of genuine issues for trial."  Robertson v. Board of

County Comm'rs of the County of Morgan, 78 F. Supp.2d 1142, 1146 (D. Colo. 1999)

(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Mares v. ConAgra Poultry

Co., 971 F.2d 492, 494 (10th Cir. 1992)).  "Once a properly supported summary

judgment motion is made, the opposing party may not rest on the allegations contained

in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. . . .  These facts may be shown 'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings by themselves.'" Southway v. Central Bank of Nigeria, 149 F. Supp.2d 1268, 1273 (D. Colo. 2001), aff'd, 328 F.3d 1267 (10th Cir. 2003).  However, "[i]n order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*. . . .  The nonmoving party does not have to produce evidence in a form that would be admissible at trial, but '"the content or substance of the evidence must be admissible."' . . . Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is "not suitable grist for the summary judgment mill."'" Adams v. American Guarantee & Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000).

"Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response." Southway, 149 F. Supp.2d at 1273.  "The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . .  Unsupported allegations without 'any significant probative evidence tending to support the complaint' are insufficient . . . as are conclusory assertions that factual disputes exist." Id.; Robertson, 78 F. Supp.2d at 1146 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); quoting White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995)). "Evidence presented must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment." Southway, 149 F. Supp.2d at

6

1274. "Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party." Id. at 1273.

Since the plaintiff is not an attorney, his pleadings have been construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  Therefore, "if the court can reasonably read the pleadings to state a claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements. . . .  At the same time, . . . it is [not] the proper function of the district court to assume the role of advocate for the pro se litigant." Id.

Defendants seek summary judgment, asserting that the undisputed facts demonstrate that they did not violate plaintiff's rights in the ways he claims as the procedural safeguards that accompanied all of defendants' decisions far exceeded the minimum process required by applicable U.S. Supreme Court and Tenth Circuit law, that the plaintiff's claims for prospective injunctive relief are moot because plaintiff has been released from prison[2] and because the Eleventh Amendment bars the injunctive relief sought as the nature of the relief is restrospective in nature and not aimed at remedying possible future violations of plaintiff's or anyone else's constitutional rights, and that they are entitled to qualified immunity.

---

[2]Plaintiff has since been re-incarcerated.

7

Plaintiff filed a response to defendants' motion (Docket No. 227), but he did not respond with specific facts showing the existence of a genuine factual issue to be tried, demonstrated by any of the kinds of evidentiary materials listed in Rule 56(c), see Southway, 149 F. Supp.2d at 1273, despite defendants placing him on notice that he must do so.  (See Docket No. 218 at 32).  Nevertheless, the court has very carefully considered the defendants' motion (Docket No. 218), plaintiff's response thereto (Docket No. 227), and applicable Federal Rules of Civil Procedure and case law and has taken judicial notice of the court's file.  The court now being fully informed makes the following findings, conclusions, and order granting the defendants' motion for summary judgment.

"The 14th Amendment to the United States Constitution provides that the State 'shall not deprive any person of life, liberty, or property without due process of law.'  Thus, to state a claim for deprivation of Due Process, the Plaintiff must first allege facts indicating that he was deprived of a liberty or property interest that is protected by the Constitution. . . .  Only if such a protectible right is established does the Plaintiff enjoy a Constitutional entitlement to a particular level of process."  Anderson v. Cunningham, 2008 WL 486488, *2 (D. Colo. Feb. 18, 2008), aff'd, 319 Fed. Appx. 706 (10th Cir. Mar. 30, 2009), pet. for cert. filed (Apr 28, 2009) (No. 08-10138).  "[I]n Sandin v. Conner, 515 U.S. 472, 484, 487 . . . (1995), the Supreme Court concluded that a prisoner is entitled to due process before he is subjected to conditions that 'impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life,' or disciplinary actions that 'inevitably affect the duration of his sentence.'"  Wilson v. Jones, 430 F.3d 1113, 1117 (10th Cir. 2005), cert. denied, Jones v. Wilson, 549 U.S. 943 (2006).  "As a

8

general rule, before officials may take actions that affect . . . protected liberty interests, they must afford a prisoner (a) advance written notice of the charges; (b) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (c) a written statement by the factfinder of the evidence relied upon and the reasons for the . . . action. . . .  In addition, the decision must be supported by some evidence."  Id.

The Tenth Circuit has found that Ad Seg "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration."  Penrod v. Zavaras, 94 F.3d 1399, 1407 (10th Cir. 1996) (quoting Hewitt v. Helms, 459 U.S. 460, 468 (1983)).  The mere placement in Ad Seg does not, on its own, implicate a liberty interest, Talley v. Hesse, 91 F.3d 1411, 1413 (10th Cir. 1996), and changing an inmate's prison classification "ordinarily does not deprive him of liberty, because he is not entitled to a particular degree of liberty in prison."  Templeman v. Gunter, 16 F.3d 367, 369 (10th Cir. 1994)).  To determine whether an inmate's placement in Ad Seg implicates a liberty interest, relevant factors might include "whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . . ; and (4) the placement is indeterminate."  Estate of DiMarco v. Wyoming Dep't of Corrections, Div. of Prisons, 473 F.3d 1334, 1342 (10th Cir. 2007).

## Claim 4

In Claim 4, plaintiff contends that defendants Reid, Lindsey, Slack, and Misel violated his right to due process of law when they reassigned him to Ad Seg in June 2005 by erroneously classifying him as a member of an STG.

9

Defendants assert in their motion for summary judgment that the facts underlying plaintiff's assignment show that he was properly assigned to Ad Seg in 2004 and that STG concerns did not play any role in his assignment.  They further contend that the undisputed evidence demonstrate that plaintiff is mistaken about the underlying reasons for his classification to Ad Seg in July 2005 and moreover that the process and review regarding the July 2005 classification meets the strictures of Wilkinson v. Austin, 545 U.S. 209 (2005).  As noted by Judge Krieger:

> In Wilkinson, . . .  the Supreme Court considered whether inmates had a liberty interest to avoid placement in Ohio's Supermax facility and whether the procedures adopted by the State of Ohio for classifying and placing inmates into a "Supermax" prison provided constitutionally adequate process.  Guided by Sandin, the Supreme Court considered the totality of the conditions at Supermax to determine whether they imposed an atypical and significant hardship.  It found that such conditions, viewed together, amounted to a sufficiently atypical and significant hardship such that there was a protected liberty interest subject to due process protection.  It also approved (but did not specifically prescribe) the pre-deprivation process offered by the State of Ohio - (1) the inmate receives notice of the factual basis for assignment to Supermax, (2) the inmate receives a fair opportunity to rebut such factual basis, (3) the inmate can submit objections to such assignment prior to the final level of review, (4) the inmate receives a short statement of reasons for the assignment, and (5) there is a placement review within 30 days after initial assignment to Supermax.

(Docket No. 139 at 10-11 (footnote omitted)).

More specifically, defendants assertions in their motion for summary judgment include the following.  Plaintiff was initially classified as Ad Seg in 2004 with no mention of gangs or STGs.  Plaintiff agreed that his initial Ad Seg classification was appropriate.  Thereafter, plaintiff was sent to a private prison in Mississippi.  Following his return to Colorado in 2005, plaintiff was provided with a notice removing him from population in June 2005.  (Docket Nos. 218-7, 218-39).  That notice did not specify that he was

affiliated with a gang or an STG threat.  Plaintiff was given notice of a hearing prior to

being classified as Ad Seg in July 2005.  (Docket Nos. 218-9, 218-39 at 2).  In fact,

plaintiff attended that hearing and spoke to the Classification Committee.  (Docket No.

218-10 - transcript).  At that time, in July 2005, that Committee noted that the plaintiff

was an "STGO Return" but did not make any finding of existing gang or STG affiliations.

The hearing transcript indicates that plaintiff was to be classified as Ad Seg due to the

horrendous nature of his acts at Buena Vista in 2004.  (Docket No. 218-10, Defs.' Ex. H

at 6).  The committee recommended that plaintiff be classified as Ad Seg and housed at

CSP.  (Docket No. 218-39 at 3, Defs.' Ex. LL at 3).  That recommendation was

approved at two subsequent levels of review.  Thereafter, plaintiff's Ad Seg status was

reviewed monthly, received extra attention from the PRO Unit committee, and was

reviewed by the CSP Warden.  (Docket No. 218-34, Defs.' Ex. FF, monthly review

forms).  Based upon the above, defendants assert that the plaintiff received far more

than the review minimums outlined in Wilkinson.  Defendants further assert that with

regard to plaintiff's classification to Ad Seg in July 2005, there is no evidence that any

defendant thought he was an STG offender in July 2005, and that his placement in Ad

Seg from July 2005 forward was not based in any way on an affiliation with an STG.

Therefore, they contend they are entitled to summary judgment on Claim 4.

Furthermore, defendants assert that if the court assumes that plaintiff was

determined erroneously to be a member or affiliate of an STG in July 2005, defendants

are nevertheless entitled to judgment on this claim because due process requires only

that there be "some evidence" to support a prison official's classification decision where

a liberty interest is at stake.  Here, they contend that plaintiff's classification reports

clearly state that his Ad Seg classification was based on his past history of being

dangerous to DOC staff and inmates, his disruptive behavior, and other factors that

occurred at Buena Vista over a long period of time and which are independent of any

perceived or actual STG affiliation.  Thus, they assert that regardless of whether they

were under the actual or mistaken impression that plaintiff was an STG, there were

powerful and persuasive non-STG reasons for his classification as Ad Seg.

Accordingly, since there allegedly was "some evidence" to support the July 2005 Ad

Seg classification determination, they contend they are entitled to summary judgment

on Claim 4.

When addressing this claim with respect to defendants' previous motion to

dismiss, Judge Krieger made the following findings:

> For purposes of this claim, the Court assumes that Mr. Blevins had
> a liberty interest to avoid placement in [Ad Seg], and that he was entitled
> to the minimal due process approved by the Supreme Court in *Wilkinson*.
> Here, Mr. Blevins alleges that he received a hearing prior to finalization of
> his assignment to [Ad Seg], for which he received advanced notice, an
> opportunity to be heard in opposition, and an opportunity to appeal.  **Such
> procedure would appear to satisfy due process.**
>
> However, what Mr. Blevins actually appears to challenge is the
> factual basis for the determination to assign him to [Ad Seg], *i.e.*, that it
> was erroneous to classify him as a member of an STG because there was
> no evidence to support such classification.  The Defendants have not
> addressed whether such a challenge falls within the purview of the Due
> Process Clause.  Arguably, it might, because it was the STG classification
> which allegedly resulted in Mr. Blevins' assignment to [Ad Seg].  In
> another context, the Tenth Circuit has stated that the Due Process Clause
> requires that there be "some evidence" to support a prison official's
> classification decision where a liberty interest was at stake.  *See Gwinn v.
> Awmiller*, 354 F.3d 1211, 1219 (10th Cir. 2004) (sex offender classification)
> (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)).  For pleading purposes,
> Mr. Blevins has stated a claim for relief in Claim 4.

(Docket No. 139 at 13-14) (footnote omitted) (emphasis added).

12

As found by Judge Krieger, even assuming that plaintiff had a liberty interest to avoid placement in Ad Seg, the procedure followed in 2005 with respect to his placement in Ad Seg following his return from Mississippi satisfies due process.  The undisputed facts show that plaintiff received advance notice of his Ad Seg hearing (Docket No. 218-9),[3] had an opportunity to be heard at the hearing and to call witnesses (but did not call any witnesses) (see Docket No. 218-10 - July 7, 2005, hearing transcript), said he was ready to proceed at that time (Docket No. 218-10 at 2, lines 20-21), was told at that hearing and in writing thereafter the reasons for housing him in Ad Seg (see Docket No. 218-10 - hearing transcript), and had an opportunity to appeal (see Docket No. 218-5 at 8, Defs.' Ex. - Administrative Regulation 600-2(IV)(O)).

As noted by Judge Krieger, what plaintiff actually appears to be challenging in this claim is the factual basis for the Ad Seg determination.  Plaintiff claims that he was erroneously classified as an STG member.  The transcript of the July 2005 Ad Seg hearing, however, does not show that STG member classification was considered as a factor in placing plaintiff back in Ad Seg following his return from Mississippi. Significantly, while the summary written on the Notice for Administrative Segregation Hearing included mention of "Security Threat Group involvement," among other things,

---

[3]The Notice for Administrative Segregation Hearing states: "SUMMARY: A review has been made regarding offender Terry Blevins' (D.O.C. # 111164) current assignment in Mississippi.  This review includes: compliance with rules and regulations, inter-action with staff, staff observation, historical data, Security Threat Group involvement and initial administrative Segregation documentation.  Based on this information; offender Blevins' actions warrant placement in Administrative Segregation."  (Docket No. 218-9). This notice was served on plaintiff on July 1, 2005, which was six days before the hearing.  The notice was read to plaintiff at the beginning of the hearing.  (Docket No. 218-10 at 3).

no finding was made during the actual hearing that the plaintiff was a member of a gang

or that he had STG affiliations.  During the hearing, plaintiff pointed out that he had not

had a write-up in nineteen months, and the Chairman responded, "And that's what we

understand by reading some of your Mississippi records.  Um, we're also gonna take

into account what did er Buena Vista I guess in Department of Corrections before you

went eh.  But we gotta take that in . . . .  I think your good behavior though in

Mississippi, if it's our decision indeed to place you in [Ad Seg], if that happens, any good

behavior you demonstrated down there is gonna really count when you do.  Uh so, we'll

just review all of that stuff but yeah, your point's well taken.  You did do well while you

were in Mississippi."  (Docket No. 218-10 at 4-5).  After going off the record to discuss

the case, the Chairman came back on record and stated the following determination:

> at this time it's gonna be our decision to place you in [Ad Seg].  We're
> doing that primarily the snap shot of the behavior that you presented to us
> while at Buena Vista.  And I know that's been a while back, but it was
> some pretty stuff . . . .  Possession Davis [sic] contraband, assault,
> advocating (inaudible) destruction that stuff, but we do that with full
> understanding of your good behavior while in Mississippi.  We don't review
> your record and see that you were in any-you weren't public enemy
> number one, by any stretch of the imagination, okay? . . .  Well, I-I'll
> definitely make note that behavior while in Mississippi was-was better than
> average I think what we'll easily be able to say.  So it is going to be our
> decision to go ahead and place you in ad seg.  Now be advised that our
> decision is not final until it's affirmed by the warden or appointing authority
> or the office of offender services. . . .  So you will receive a written
> decision.  Now from the day you receive that written decision you're gonna
> have 7 days to file an appeal. . . .  If you want to appeal, they'll that on DC
> form 150-1D . . . .

(Docket No. 218-10 at 6-7).  Plaintiff was given opportunities during that hearing to ask

any questions, and he asked only about his television.  (Docket No. 218-10 at 6, line

14).  He never asked or expressed any concern about the Committee considering STG

14

affiliations.

On July 11, 2005, a Classification Summary - Administrative Segregation

Hearing form was issued which states in pertinent part:

> WITNESSES: None called or requested.
> EVIDENCE RELIED UP: Notice of Ad Seg from Offender Services, working file review, computer search, testimony of offender and of staff participating in the review process.
>
> FINDING OF FACT:
> Blevins was sent to Mississippi due to STGO justifications, special placement strategies were required to manage his behavior.  He returned to CSP on 06/28/2005.  After reviewing behavior in the past year, disciplinary history, STGO placement, and past Ad Seg placement it is determined that Administrative Segregation is appropriate at this time.
>
> DECISION:
> Assign to MAXIMUM SECURITY, Administrative Segregation. . . Yes
> REASON(S) His presence in the Colorado Department of Corrections General Population setting, would pose a serious threat to the safety of others and the safe operations of the facility.  Administrative Segregation placement is appropriate at this time.

(Docket No. 218-34 at 44).  While the decision mentions plaintiff "was sent to

Mississippi due to STGO justifications" and "STGO placement," it does not state that

STG membership was one of the reasons for the determination.  In any event, this court

finds that the Ad Seg decision is supported by the requisite "some evidence" and thus

does not violate due process.[4]  See Gwinn v. Awmiller, 354 F.3d 1211, 1219 (10th Cir.

_____

[4]Plaintiff testified at his deposition that he deserved Ad Seg in 2004.  (Docket No. 218-19 at 28).  Such placement was based on a facility disruption, assault on staff, contraband item ("I essentially had a knife.").  (Docket No. 218-19 at 28).  Plaintiff needed a knife "because [he] was having a bad day" with one of the guards at Buena Vista, and "if [he] could have gotten [his] hands on him, yeah, [he] would have done [his] level best to kill him."  (Docket No. 218-19 at 29).  Plaintiff stated during his deposition that back in 2004, he "was having a bad week. But I'm feeling better now."  (Docket No. 218-19 at 34).

2004) (in the context of an inmate being classified as a sexual offender, holding that due process requires "some evidence to support the hearing panel's decision") (citing <u>Wolff v. McDonnell</u>, 418 U.S. 539, 592 (1974)).  Therefore, summary judgment shall be granted to defendants on this claim.

## Claim 5

In Claim 5, plaintiff asserts that defendant Reid violated his right to due process of law in October 2005 when he conducted a Warden Review Hearing without advance notice, considered plaintiff's attitude in determining whether to remove him from Ad Seg, and failed to advise plaintiff in writing of the outcome of the review.

This court, however, agrees with defendants' arguments in response that continued confinement to Ad Seg requires only "some sort of periodic reviews," <u>Hewitt v. Helms</u>, 459 U.S. at 477 n.9, which do not necessarily require that prison officials allow inmates to submit evidence or make statements.  <u>Id.</u>  In fact, as defendants assert, unlike the situation when an inmate is initially classified to Ad Seg, <u>Hewitt</u> does not require that an inmate be allowed to participate in the review at all.  <u>Id.</u>  <u>See</u> <u>Robinson v. Roberts</u>, 2009 WL 539924, *11 (D. Kan. Mar. 4, 2009) ("Dicta in *Hewitt* notes that confinement to Ad Seg requires 'some sort of periodic review,' such that placement is not "a pretext" for indefinite confinement.  *Hewitt*, 459 U.S. at 477 n.9. Although the Tenth Circuit has not addressed the issue, other courts have held that 'some sort of periodic review' is in fact required by *Hewitt*, but the review does 'not necessarily require that prison officials permit the submission of any additional evidence or statements.'  <u>Id.</u>  <u>See, e.g.,</u> <u>McClary v. Kelly</u>, 237 F.3d 185, 186 (2d Cir. 2001); <u>Alston v. DeBruyn</u>, 13 F.3d 1036, 1042 (7th Cir. 1994); <u>Toussaint v. McCarthy</u>, 801 F.2d 1080,

1101 (9th Cir. 1986); <u>Jones v. Mabry</u>, 723 F.2d 590, 594 (8th Cir. 1983) (due process

requires procedure for periodic review of administrative segregation status), . . . .").

     As noted by defendants, CDOC regulations provided for weekly or monthly

reviews of plaintiff's Ad Seg assignment, which were done here.  <u>See</u> Docket No. 218-5,

AR 600-02(IV)(Q).  "Due process requires no more than the 30-day review procedure

that [plaintiff] alleges he has received."  <u>Toevs v. Reid</u>, 2009 WL 598258, *8 (D. Colo.

Mar. 6, 2009) (citing <u>Rahma X v. Morgan</u>, 300 F.3d 970, 973-74 (8th Cir. 2002)

(reconsideration of housing assignment every 60 days constituted sufficient due

process); <u>Jones v. Mabry</u>, 723 F.2d 590, 594 (8th Cir. 1983 (due process requires

procedure for periodic review of [Ad Seg] status); <u>Hunt v. Sapien</u>, 480 F. Supp. 2d 1271,

1277 (D. Kan) (placement was not indefinite where reviewed weekly for the first 60

days, and subsequently reviewed monthly, after 180 days, and annually),

*reconsideration denied*, 2007 WL 1520906 (D. Kan. 2007); <u>DeMarco</u>, 473 F.3d at 1343

(due process satisfied where placement was reviewed every 90 days)).

     One additional periodic review provided by the CSP regulations is a Warden's

Review, which is to take place when an offender had been at CSP a minimum of 36

months, had not had any COPD convictions for 24 consecutive months, and was at

Quality of Life Level 3.  (Docket No. 218-4 at 3, Defs.' Ex. B at 3, § IV(BB); Ex. D at 4, §

IV(CC).  Under such regulations, plaintiff was not "entitled" to a Warden's Review at all

in 2005 because he had not been at CSP and classified as Ad Seg for 36 consecutive

months either in 2005 or at any time during his incarceration.  In any event, as part of

the process for periodic reviews of Ad Seg placement, this court agrees with the

defendants that there is no requirement for advance notice of a Warden's Review.

17

Plaintiff was nevertheless present at the review, was given a chance to participate, and was told the outcome, namely, that he would not be moved out of Ad Seg.  Also, as asserted by defendants, the Warden's decision not to move the plaintiff was supported by, among other things, the Classification Committee's findings and conclusions about plaintiff shortly after his Warden's Review.  As noted by defendants, at that time, the Committee determined that plaintiff was to remain in Ad Seg due to his "Lack of Program Participation."  (Docket No. 218-34 at 33, Defs.' Ex. FF, Review dated Oct. 14, 2005, middle of page).[5]

Furthermore, this court further agrees with the defendants that there is neither a requirement for nor a proscription against a Warden considering an inmate's "attitude" when performing his review.  In fact, as shown by the defendants, the PRO Unit Participation Acknowledgment form, signed by plaintiff, notes that "behavior and attitude" are critical aspects of the inmate's ability to remain in the PRO Unit curriculum. (Docket No. 218-36, Defs.' Ex. HH, ¶ 1) ("The PRO Unit is a behaviorally based program.  As such, my behavior and attitude while in the PRO Unit will be closely monitored.  In appropriate behavior or a poor attitude may result in a change of Quality of Life Level.").

---

[5] While plaintiff notes in his response that he could participate in only one program at a time and did so, it appears from the various Ad Seg Classification Review forms that a number of programs were recommended for completion, namely, anger management, personal awareness strategies, prison life skills, and crime impact on victims.  His completion of various courses was noted on the series of Ad Seg Classification Review forms.  It appears that once he finally completed three of the four recommended courses, "Lack of Program Participation" was no longer checked off as a justification for retaining him in Ad Seg.  (See Docket No. 218-34 at 24, Ad Seg Classification Review form dated July 11, 2006).

18

This court concludes that the procedures employed to retain plaintiff in Ad Seg and not progress him to the PRO Unit were constitutionally adequate and that the defendants are thus entitled to summary judgment on Claim 5.

**Claim 6**

In Claim 6, plaintiff contends that defendants Reid and Martinez violated his right to due process of law when they did not notify him of a second Warden Review Hearing, which he asserts occurred in December 2006 or January 2007, nor of the resulting decision.  There is no evidence, however, that there was a second Warden Review Hearing as claimed by plaintiff.  In fact, plaintiff testified at his deposition that the second review was "not noted anywhere, even my case manager didn't know about it."  (Docket No. 218-19 at 40).  In any event, as found above with respect to Claim 5, the procedures for Ad Seg placement review utilized by the CDOC were constitutionally sufficient, and thus the existence or non-existence of a Warden's Review in December 2006 or January 2007 has no impact on the determination of whether plaintiff was denied procedural due process as he alleges.  Defendants are thus entitled to summary judgment on Claim 6.

**Claim 7**

In Claim 7, plaintiff asserts that defendants Barr, Martinez, Davidson, Gail, John Doe, and Jane Doe violated his right to due process of law by not giving him advance notification of the July 2007 PRO Unit review hearing.

In response, defendants assert that it is not clear what sort of notice to which plaintiff thought he was entitled.  They note it is clear from plaintiff's Complaint that he

19

attended and provided testimony at the July 2007 PRO Unit meeting, and he also

signed the PRO Unit Acknowledgment form in June 2007 in anticipation of attending the

PRO Unit meeting.  (Docket No. 218-36, Defs.' Ex. HH).   Furthermore, defendants once

again assert that confinement in Ad Seg requires only "some sort of periodic review,"

Hewitt v. Helms, 459 U.S. at 477 n.9, and here CDOC reviewed plaintiff's Ad Seg

confinement every seven days for the first two months of his confinement and every

thirty days thereafter.  (Docket Nos. 218-32, 218-33, 218-34, Defs.' Ex. DD, EE, and FF

- classification reviews from 2004 to 2008).   According to the defendants, such reviews

alone satisfy the minimum requirements approved by the U.S. Supreme Court to satisfy

a due process challenge to Ad Seg classification, and plaintiff received more reviews.

He was reviewed specifically for progression to the PRO Unit every six months or more

often (Docket No. 218-34, Defs.' Ex. FF, summary dated 5/22/08, indicating PRO Unit

evaluations on 8/1/06, 12/1/06, 6/19/07, 8/8/07, 3/18/08 and successful admission to the

PRO Unit in April 2008).  Defendants further note plaintiff's own allegations claim that

he had  "Warden's Reviews" while he was classified Ad Seg.  Defendants contend that

the reviews of plaintiff's Ad Seg status at CSP went far beyond the minimum  approved

by the Supreme Court.  They assert there is no constitutional requirement that plaintiff

be given written notice, time to prepare, time to identify witnesses, a formal written

response, and all of the other requirements he seems to want to assign to the

defendants in this case.  Therefore, defendants assert they are entitled to summary

judgment on Claim 7.  This court agrees with all of these assertions and finds that

defendants are entitled to summary judgment on this claim.

**Claim 8**

20

In Claim 8, plaintiff contends that defendants Barr, John Doe, Davidson, Martinez, Gail, and Jane Doe violated his right to due process of law because they based their August 2007 decision to revoke his assignment to the PRO Unit upon what he wrote in his essays and denied him an opportunity to defend his essays at the hearing.

This court notes that contrary to plaintiff's assertion, plaintiff's placement in the PRO Unit was never "revoked."  Instead, plaintiff was not approved at all levels of the PRO Unit review process.  See Docket No. 218-4 at 2-4, Administrative Regulation 600-02).

Furthermore, it is undisputed that most inmates are requested to write essays prior to final approval into the PRO Unit.  (Docket No. 218-14 at 3, ¶ 4, Defs.' Ex. L, Martinez Aff. ¶ 14(d)); Docket No. 218-15 at 1, ¶ 6, Defs.' Ex. M, Barr Aff. ¶ 6; Docket No. 218-11 at 2 ¶ 9, Defs.' Ex. I, Beard Aff. at 2 ¶ 9).  These "essays assist the Committee to evaluate the inmate's desire and chances to succeed in the PRO Unit."  (Docket No. 218-14 at 3, ¶ 4; see also Docket No. 218-11 at ¶ 9:  "As part of the PRO Unit interviews, every inmate writes essays to the Committee to be evaluated in order to demonstrate that they are committed to the program and have a good chance to succeed.  Some inmates are asked to write essays related to security issues.").  As noted by the defendants, plaintiff was initially approved for participation in the PRO Unit curriculum and was asked to write two essays.  It was determined, however, that the plaintiff's essays contained offensive and racially-charged language, namely, words such as "nigger" and "fag."  (Docket No. 218-15 at 2 ¶ 8; Docket No. 218-17 at 2, ¶ 7).  In addition, in one of the essays, plaintiff espoused killing gang members.  (Docket No.

218-17 at 2, ¶ 7).

According to defendant Barr, the PRO Unit Committee asked plaintiff to come to a meeting and discuss the essays, and plaintiff "discussed the essay and was defiant about using the language.  He indicated he would use whatever language he pleased." (Docket No. 218-15 at 2 ¶ 8; see Docket No. 218-17 at 2, ¶ 8).  Barr, however, gave plaintiff a second chance to write an essay without violence-provoking language. (Defs.'s Ex. I, ¶¶ 21, 22).

Plaintiff admits he used the same language in his subsequent essay in which he defended his use of the challenged language.  In addition, he participated in a second PRO Unit meeting on August 8, 2007.  (Docket No. 99, Compl. at 7, ¶ C; Defs.' Ex. O, ¶¶ 8-11).  In his response to the summary judgment motion, plaintiff continues to defend his usage of the language found to be offensive, namely, the words "nigger" and "fag," claiming he "did use the word nigger but used the correct definition of the word.  By definition nigger means an uneducated illiterate person.  I even supplied the definition when I wrote the essay.  Now staff is so narrow minded that they only use the word as racist then maybe they are the racists and just trying to deflect their beliefs on me. Plaintiff did not use the word 'fag.'  He used the phrase 'fag out' which means a person who is lazy at work.  Again plaintiff provided the definition in his essay."  (Docket No. 227 at 4).

Barr, however, states in his affidavit that plaintiff "using inflammatory language is a building block to violence and lawless behavior because of the high likelihood of violence and threats that come from using such language in prison. . . .  Behavioral modification is one of the central goals of the [CDOC], and certainly a goal of Level V

22

facilities that house the most dangerous and disruptive inmates.  Accordingly,

expressing racial hatred and using inflammatory language is incompatible with the goals

of the PRO Unit, shows a poor attitude, and demonstrates that [plaintiff] would have

virtually no ability to succeed in the PRO Unit."  (Docket No. 218-15 at 2, ¶¶ 11, 12).

Defendant Vigil, a Case Manager II who works on the High Security Management

Team, similarly states:

> Use of the words "nigger" or "fag" in the highly volatile PRO Unit
> setting, would very likely result in violence toward [plaintiff] by other
> inmates, and therefore the necessity for DOC personnel to be involved in
> a dangerous situation.  Similarly, [plaintiff] had a history and propensity for
> violent, threatening and disruptive behavior. . . .  Overall, [plaintiff's] essay
> responses indicated he was far from ready to participate in the PRO Unit.
> Instead, [plaintiff] would likely have caused an immediate facility disruption
> and a dangerous situation given what he stated in his application memos.

(Docket No. 218-17 at 2, ¶¶ 9, 10).  Non-party William Beard, plaintiff's case manager at

CSP on and after June 2005, states in his affidavit that "[i]n short, racially and sexually

charged language such as that used by Blevins can form the basis of all the behaviors

that the PRO Unit seeks to avoid."  (Docket No. 218-11 at 3, ¶ 22).

This court finds that the refusal to progress plaintiff into the PRO Unit does not

implicate a protected liberty interest.  Progression into the PRO Unit was merely part of

the several  "quality of life" levels in Ad Seg.  (See Docket No. 218-6 at 1).  The Pro Unit

is Quality of Life levels four through six and is a "[s]pecialized program that is designed

to transition offenders from [Ad Seg] to general population."  (Docket No. 218-6 at 1, ¶

III(R)).  In <u>Sandin</u>, 515 U.S. at 483-84, the United States Supreme Court "redefined the

scope of prisoner due process claims and clarified the proper approach for their

analysis."  <u>Klein v. Coblentz</u>, 1997 WL 767538 (10th Cir. Nov. 19, 1997).  The Court

noted in <u>Sandin</u> that although

> States may under circumstances create liberty interests which are
> protected by the Due Process Clause . . . [those] interests will be generally
> limited to freedom from restraint which, while not exceeding the sentence
> in such an unexpected manner as to give rise to protection by the Due
> Process Clause of its own force, . . . nonetheless imposes atypical and
> significant hardship on the inmate in relation to the ordinary incidents of
> prison life.

<u>Id.</u> (quotations omitted).  This court finds that the decision not to approve plaintiff's

progression did not "inevitably affect" the duration of plaintiff's confinement or impose an

"atypical and significant hardship in relation to the ordinary incidents of prison life."  <u>Id.</u>

See <u>Borrego v. Mathews</u>, 2009 WL 812158, *9 (D. Colo. Mar. 26, 2009) (reduction from

Level 3 to 2 in the Quality of Life Level Program at CSP, among other things, did not

"inevitably affect" the duration of plaintiff's confinement or impose an 'atypical and

significant hardship in relation to the ordinary incidents of prison life.'").

In any event, even if there was a protected liberty interest, this court further

agrees with defendants that at its heart, this claim is a challenge to plaintiff's continued

classification to maximum Ad Seg.  As found above, plaintiff received adequate periodic

review of his status.  In addition, there was clearly "some evidence" to support the

committee's classification decision, regardless of whether the court characterizes the

committee's decision as one to retain plaintiff in Ad Seg or to not move plaintiff into the

PRO Unit.  As noted by the defendants, it is well settled that the courts will not

"scrutinize and interfere with the daily operations of a state prison."  (Docket No. 218 at

45, citing <u>Peterson v. Shanks</u>, 149 F.3d 1140, 1144 (10th Cir. 1998)).  Here, defendants

stated legitimate penological interests in not progressing plaintiff to the PRO Unit,

including plaintiff's usage of inflammatory language, notwithstanding plaintiff's claim that

24

he used the "correct definition" of the words.

In sum, this court finds that the plaintiff has not established a constitutional violation for not being progressed or for not obtaining final approval to the PRO Unit.

Furthermore, defendants Martinez, Gail, and Davidson have established that they did not personally participate in the alleged constitutional violation.  More specifically, defendants have shown that Martinez was employed at Arkansas Valley Correctional Facility as of June 2007 and had no contact or interaction with plaintiff or his case after that time.  Similarly, defendants have shown there were no employees named Davidson and Gail at CSP or CCF in July or August 2007.  In fact, defendants Gail and Davidson have never been served with process.

Based upon the above, this court finds that the defendants are entitled to summary judgment with respect to Claim 8.

## Claim 11

In Claim 11, plaintiff asserts that defendants Barr and Martinez retaliated against him when they decided not to move him to the PRO Unit because plaintiff was suing Reid over plaintiff's placement.

The Tenth Circuit has held that "'[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his' constitutional rights. . . . 'This principle applies where the action taken in retaliation would be otherwise permissible.'"

Id.  The court further noted, however, that

> [a]s the Supreme Court made clear . . . however, it is not the role of the
> federal judiciary to scrutinize and interfere with the daily operations of a
> state prison, and our retaliation jurisprudence does not change this role.
> Obviously, an inmate is not inoculated from the normal conditions of
> confinement experienced by convicted felons serving time in prison merely

because he has engaged in protected activity.  Accordingly, **a plaintiff "must prove that 'but for' the retaliatory motive, the incidents to which he refers . . . would not have taken place." . . .  An inmate claiming retaliation must "allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights.**"

<u>Id.</u>

Defendants have shown that available records indicate that plaintiff did not have a PRO Unit hearing in December 2006.  Instead, CSP's Classification Committee met in early December 2006 to review plaintiff's placement in Ad Seg, and plaintiff was approved by the Committee to progress to a PRO Unit hearing at some point in the future for evaluation.  (Docket No. 218-34 at 19; Defs.' Ex. FF, Ad Seg Classification Reviews, Review dated 12/8/06 - "Approved Classification 12/01/2006 No STG required").  Accordingly, defendants assert there is no evidence to support that any person, let alone a named defendant, denied plaintiff to access to the PRO Unit in December 2006.

Next, defendants contend that as previously argued, even if a named defendant denied plaintiff's bid to be re-classified and moved to the PRO Unit, courts generally do not interfere with the operation of prisons, and plaintiff has provided no evidence that any meaningful change had occurred or that he had made any meaningful progress that would have warranted a change in his status such that he could attend the PRO Unit. Furthermore, they assert that moreover given that eight months later in August 2007 plaintiff was still not eligible to attend the PRO Unit, it seems unlikely that he would have been eligible or ready for the PRO Unit in December 2006.  Defendants argue that the reasons for not progressing plaintiff to the PRO Unit are sufficiently related to a

legitimate penological interest so as to show that plaintiff is unable to establish that "but for" a retaliatory motive, he would have been moved to the PRO Unit. Furthermore, they contend that claims based on mere speculation rather than evidence are not actionable under the retaliation standard.  Therefore, they assert they are entitled to judgment on Claim 11 as a matter of law.

This court finds that in this case, the record clearly establishes that plaintiff's continued placement in Ad Seg and the denial to progress him into the PRO-Unit was based on justified security and behavioral concerns.  Plaintiff has not shown that "but for" his litigation, he would have been moved into the Pro Unit.  His retaliation claim is merely based on speculation.  Therefore, defendants are entitled to summary judgment on Claim 11.

## Claim 12

Finally, in Claim 12, plaintiff contends that defendants Barr, John Doe, Davidson, Martinez, Gail, and Jane Doe retaliated against him when they decided in August 2007 to deny him a transfer into the PRO Unit and to keep him at CSP because he had commenced a lawsuit against Reid over his placement and because of the contents of an essay he wrote.

In response, defendants have shown that Martinez, Davidson, and Gail were either employed elsewhere or were not employees of the CDOC at the time of the alleged constitutional deprivations, and thus judgment in their favor is appropriate. Furthermore, defendants Barr and Vigil assert they are entitled to judgment as a matter of law on Claim 12.  They once again argue that the decision not to progress and transfer plaintiff to the PRO Unit was based on inmate and facility security, a legitimate

penological interest.  They note once again that plaintiff wrote essays that contained racist and other defamatory language, which if used in the PRO Unit setting would be highly likely to result in fights, injuries, and possibly deaths and facility disruptions. Such results would be a danger to plaintiff, to CDOC employees, to other inmates, and to the reasonably smooth operation of a prison facility.  Next, defendants note that plaintiff's essays were designed, in part, to determine his level of commitment to the PRO Unit and to progressing out of Ad Seg (Defs.'s Ex. I, ¶ 9-12), yet plaintiff himself stated in one of his essays that he did not believe he would succeed.  (Defs.' Ex. JJ at 4-5).  Defendants further contend that "[b]ecause, according to the Complaint, the PRO-Unit committee's decision was based on [plaintiff's] inappropriate essays, <u>and</u> [plaintiff] was given a second chance to write appropriate essays, <u>and</u> the determination not to progress [plaintiff] was clearly related to legitimate penological interest, it cannot be said that the 'actual motivating factor' for the decision to revoke [plaintiff's] acceptance for the PRO-Unit was retaliation for his prior lawsuits or grievances."  (Docket No. 218 at 50) (emphasis in original).

This court agrees with the defendants' assertion that the reasons for not progressing plaintiff to the PRO Unit, including his essays, are sufficiently related to legitimate penological interests and show that plaintiff is unable to satisfy the "but for" retaliation test.   Plaintiff has not shown that "but for" his litigation, he would have been moved into the Pro Unit.  His retaliation claim is merely based on speculation. Therefore, defendants are entitled to summary judgment on Claim 12.

Based upon the findings above, it is unnecessary to address defendants' additional arguments concerning injunctive relief and qualified immunity.

28

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Docket No. 218) is granted.  Judgment shall enter in favor of the defendants and against the plaintiff on all remaining claims, namely, Claims 4, 5, 6, 7, 8, 11, and 12.  Defendants shall have their costs.  It is thus further

**ORDERED** that the Trial Preparation Conference set for September 29, 2009, at 9:30 a.m., and the jury trial set for October 19, 2009, at 8:30 a.m. are vacated.

Date:  July 27, 2009                    s/ Michael J. Watanabe
       Denver, Colorado                 Michael J. Watanabe
                                        United States Magistrate Judge